UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

FRANK VENEZIA                                    CIVIL ACTION

VERSUS                                           NO: 12-2168

CONOCOPHILLIPS COMPANY                           SECTION: R(4)

**ORDER AND REASONS**

     Before the Court is defendant ConocoPhillips Company's motion for summary judgment.[1] For the following reasons, the Court grants defendant's motion.

**I.   BACKGROUND**

     This dispute arises out of an accident that occurred on June 30, 2012, as workers installed a drilling rig structure onto an off-shore oil and gas platform.[2] The site of the accident was the deck of a "pony structure," which is an attachment to an oil and gas platform that a drilling rig and other related equipment sit atop.[3] The pony structure was fabricated independently of the main platform, but once installation of the drilling rig was complete, the pony structure became a permanent part of the platform.[4]

     Plaintiff Frank Venezia raises claims of negligence against

_____

[1] R. Doc. 20.

[2] R. Doc. 1 at 2.

[3] R. Doc. 20-1 at 3-4.

[4] R. Doc. 20-2 at 2.

ConocoPhillips Company ("ConocoPhillips").[5] ConocoPhillips is part-owner of the MAGNOLIA platform.[6] The MAGNOLIA platform is an immobile platform used for oil and gas drilling and production.[7] The MAGNOLIA platform is permanently attached to the sea bottom of the Outer Continental Shelf approximately 180 miles south of Cameron, Louisiana.[8] ConocoPhillips hired Nabors Offshore Corporation ("Nabors") to design, fabricate, and install a drilling rig and pony structure onto the MAGNOLIA platform.[9] Venezia was employed by Nabors.[10]

Venezia alleges that he injured his knee when his foot slipped into a small opening on the pony structure deck.[11] He was walking across the deck to retrieve a tool for a co-worker.[12] Venezia stepped over an opening to reach the tool, and as he turned around to return along the same path, his foot slipped into that opening.[13] Venezia testified that he was aware of

---

[5] R. Doc. 1.

[6] R. Doc. 20-2 at 1.

[7] *Id.* at 2.

[8] *Id.*

[9] R. Doc. 20-2 at 1-2.

[10] R. Doc. 20-3 at 6.

[11] R. Doc. 20-3 at 52-53, 58.

[12] *Id.* at 49-50.

[13] *Id.* at 50-53, 58.

openings in the pony structure deck before his accident and aware
that at least some of the openings would ultimately be filled
with drilling equipment as part of the work Nabors employees were
performing to install the pony structure onto the MAGNOLIA
platform.[14]

The central issues in this motion are whether ConocoPhillips
owed a duty of care to Nabors employees to maintain the pony
structure in a safe condition; whether it exercised operational
control over the work that Nabors was contracted to perform; and
whether ConocoPhillips had custody or control of the site of
Venezia's accident, the pony structure, at the time of the
injury.

In May of 2011, ConocoPhillips and Nabors entered into a
Master Drilling Contract (the "Contract").[15] Under the terms of
the Contract, ConocoPhillips hired Nabors as an independent
contractor to drill, complete, plug or abandon wells as provided
in subsequent Drilling Orders.[16] The Contract gives
ConocoPhillips the right to stop work by Nabors at its own
discretion or take over work from Nabors in the event of
performance default or safety violations by Nabors.[17] In

---

[14] *Id.* at 18-19, 31-32, 55.

[15] R. Doc. 20-2 at 5-23.

[16] *Id.* at 5, 11.

[17] *Id.* at 6.

3

addition, the Contract allows ConocoPhillips to require Nabors to remove any Nabors employee from the job site.[18] The Contract requires Nabors to report any problem, accident, or occurrence that results in injuries and to furnish daily drilling reports to ConocoPhillips.[19]

The Contract also includes an attached document that sets the minimum safety expectations for contractors hired by ConocoPhillips.[20] The Contractor Health, Safety, and Environment (HSE) Requirements attached to the Contract begin by saying that "[Nabors] shall be solely responsible for the safety and health of its Personnel."[21] The HSE Requirements also require Nabors to "[use] its own experience and knowledge, [to] ascertain that the premises are safe for the proposed work before commencing operations."[22]

The HSE Requirements contain a chart that guides what are known as "Process Safety Management" relationships between ConocoPhillips and Nabors. The chart governs only those activities occurring on facilities governed by the Occupational Safety and Health Administration's ("OSHA") standard for Process

---

[18] *Id.* at 11.

[19] *Id.* at 7

[20] *Id.* at 11, 24.

[21] *Id.* at 24.

[22] *Id.*

Safety Management of Highly Hazardous Chemicals, codified at 29 C.F.R. § 1910.119. ConocoPhillips's responsibilities under the PSM chart mainly relate to identifying safe work practices and ensuring that Nabors complies with those practices.[23] For example, according to the PSM Requirements chart, ConocoPhillips must "identify safe work practices that [Nabors] needs to follow," initiate a questionnaire to obtain and evaluate the safety and health performance of Nabors, conduct periodic safety and health performance reviews of Nabors, periodically inspect to ensure that Nabors employees follow safe work practices, identify unique hazards, and investigate accidents.[24]

On May 15, 2012, pursuant to the Contract, ConocoPhillips and Nabors executed a Drilling Order and Well Specification under which ConocoPhillips hired Nabors as an independent contractor to furnish a complete and functional drilling rig on the MAGNOLIA platform.[25] Additionally, Nabors designed, fabricated and installed the pony structure, which holds the drilling rig and equipment and became a permanent part of the MAGNOLIA platform after its installation of the drilling rig was complete.[26]

Although Venezia completed a ConocoPhillips safety

---

[23] *Id.* at 29.

[24] *Id.*

[25] *Id.* at 1, 16.

[26] *Id.* at 2.

orientation program before beginning work on the pony structure, Venezia testified that he took all directions and instructions from his Nabors supervisor and never took directions or instructions from a ConocoPhillips employee.[27] Venezia further testified that Nabors handled the actual operations of the installation work of the pony structure, and a Nabors employee led the job safety analysis meetings associated with the work.[28]

ConocoPhillips Well Safety and Environment Representative, Byron McMichael, testified that Nabors is responsible for the actual day-to-day operations on the MAGNOLIA platform, and, even though ConocoPhillips provides a crane to move equipment, Nabors employees operate it and make all decisions regarding when and where to move equipment.[29] McMichael also testified that he participated in some, but not all, safety meetings and job safety analysis meetings with Nabors employees.[30]

Mark Hildebrand, the Drilling Superintendent for ConocoPhillips, indicated that ConocoPhillips was responsible for the MAGNOLIA platform itself but not for the pony structure.  He also affirmed that at the time of Venezia's incident, the installation of the drilling rig onto the platform was only 50%

---

[27] R. Doc. 20-3 at 36, 70.

[28] *Id.* at 25-26.

[29] R. Doc. 27-1 at 70,72.

[30] *Id.* at 69.

complete.[31] Hildebrand further indicated that Nabors was reimbursed for the design, fabrication, and associated material costs of the pony structure.[32] Additionally, Hildebrand testified that on the day of Venezia's accident, ConocoPhillips crew members were present on the MAGNOLIA platform, although he himself was not present.[33]

ConocoPhillips moves for summary judgment on the grounds that, under Louisiana law, a principal is liable for the negligence of its independent contractor only if the contract work involved ultrahazardous activities or the principal retains operational control of the work. It argues that no material issue of fact exists to whether either element is present here. ConocoPhillips further argues that it did not have custody of the area where the accident occurred, the pony structure, and that it cannot be liable for a defect in the construction of the pony structure because the drilling rig was under construction at the time of Venezia's accident. Venezia argues that ConocoPhillips is liable for its own acts of negligence on the pony structure, despite the independent contractor-status of Venezia's employer, Nabors. Venezia also argues that ConocoPhillips retained operational control of Nabors' activities on the pony structure,

---

[31] R. Doc. 20-2 at 2; R. Doc. 27-1 at 17.

[32] R. Doc. 20-2 at 2.

[33] R. Doc. 27-1 at 8.

and that it was in custody of the pony structure at the time of the accident.

## II. LEGAL STANDARD

Summary judgment is warranted when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994). When assessing whether a dispute as to any material fact exists, the Court considers "all of the evidence in the record but refrains from making credibility determinations or weighing the evidence." *Delta & Pine Land Co. v. Nationwide Agribusiness Ins. Co.*, 530 F.3d 395, 398 (5th Cir. 2008). All reasonable inferences are drawn in favor of the nonmoving party, but "unsupported allegations or affidavits setting forth ultimate or conclusory facts and conclusions of law are insufficient to either support or defeat a motion for summary judgment." *Galindo v. Precision Am. Corp.*, 754 F.2d 1212, 1216 (5th Cir. 1985) (internal quotation marks omitted).

If the dispositive issue is one on which the moving party will bear the burden of proof at trial, the moving party "must come forward with evidence that would entitle it to a directed verdict if the evidence went uncontroverted at trial." *Int'l Shortstop, Inc. v. Rally's, Inc.*, 939 F.2d 1257, 1263-64 (5th

Cir. 1991)(citation omitted). The nonmoving party can then defeat
the motion by either countering with sufficient evidence of its
own, or "showing that the moving party's evidence is so sheer
that it may not persuade the reasonable fact-finder to return a
verdict in favor of the moving party." *Id.* at 1265.

If the dispositive issue is one on which the nonmoving party
will bear the burden of proof at trial, the moving party may
satisfy its burden by merely pointing out that the evidence in
the record is insufficient with respect to an essential element
of the nonmoving party's claim. *See Celotex*, 477 U.S. at 325. The
burden then shifts to the nonmoving party, who must, by
submitting or referring to evidence, set out specific facts
showing that a genuine issue exists. *See id.* at 324.

The nonmovant may not rest upon the pleadings, but must
identify specific facts that establish a genuine issue for trial.
*Id.* at 325. *See also Little*, 37 F.3d at 1075 ("Rule 56 '*mandates*
the entry of summary judgment, after adequate time for discovery
and upon motion, against a party who fails to make a showing
sufficient to establish the existence of an element essential to
that party's case, and on which that party will bear the burden
of proof at trial.'") (citing *Celotex*, 477 U.S. at 332).

## III. DISCUSSION

The Outer Continental Shelf Lands Act, 43 U.S.C. § 1333, *et
seq.*, applies to disputes that arise from injuries on fixed oil

platforms located on the Outer Continental Shelf. *See* 43 U.S.C. § 1333 (a)(2)(A); *Rodrigue v. Aetna Cas. and Sur. Co.*, 395 U.S. 352, 355 (1969). The Outer Continental Shelf Lands Act also applies to claims that arise from injuries that occur during the installation of drilling rigs that must be transported to and installed onto a platform, as is the case here. *Ainsworth v. Shell Oil Co.*, 649 F. Supp. 1223, 1223 (W.D. La. 1986); *see also Ainsworth v. Shell Offshore, Inc.*, 829 F.2d 548, 549 (5th Cir. 1987).

Under the Outer Continental Shelf Lands Act, the law of the adjacent state applies unless the principles of the applicable state law conflict with any federal law. 43 U.S.C. § 1333 (a)(2)(A); *Rodrigue*, 395 U.S. at 355. Neither party has cited, nor has the Court found, any conflict between federal law and the applicable Louisiana law so the Court applies Louisiana law to this dispute. The three relevant provisions of Louisiana law are: (1) the general negligence provision, Civil Code Article 2315; (2) the custodial liability provision, Civil Code Articles 2317 and 2317.1; and (3) the premises liability provision, Civil Code Article 2322.

## A. General Liability under Article 2315

Article 2315 provides that "[e]very act whatever of man that causes damage to another obliges him by whose fault it happened to repair it." La. Civ. Code art. 2315 (1999). A principal cannot

10

be liable for injuries resulting from the negligent acts of an independent contractor "unless (1) the liability arises from ultrahazardous activities performed by the contractor on behalf of the principal or (2) the principal retains operational control over the contractor's acts or expressly or impliedly authorizes those acts." *Coulter v. Texaco, Inc.*, 117 F.3d 909, 912 (5th Cir. 1997) (citing *Graham v. Amoco Oil Co.*, 21 F.3d 643, 645 (5th Cir. 1994). However, a principal remains liable for its own acts of negligence. *Graham*, 21 F.3d at 645.

Venezia has expressly disclaimed any theory of vicarious liability and is proceeding solely on the theory that ConocoPhillips violated its own duty of care owed to him.[34] Specifically, Venezia claims that ConocoPhillips owes a general duty to exercise reasonable care for the safety of all persons on its premises, and that this duty extends to employees of independent contractors.[35] ConocoPhillips argues that no genuine issue of material fact exists as to whether it owed a duty to Venezia under Article 2315.

Whether the defendant owed a duty of care to the plaintiff is the threshold question in determining a defendant's liability under Article 2315. *Rodrigue*, 395 U.S. at 355. The duty element is a question of law, but courts must consider the "unique facts

---

[34] R. Doc. 27 at 6.

[35] *Id.* at 5.

11

and circumstances" of the claim to determine whether a duty exists. *Id.*

The Louisiana Supreme Court has held that under Article 2315, an "owner or operator of a facility has the duty of exercising reasonable care for the safety of persons on his premises and the duty of not exposing such persons to unreasonable risks of injury or harm." *Mundy v. Dep't of Health and Human Res.*, 620 So. 2d 811, 813 (La. 1993). Both the Fifth Circuit and this Court have found summary judgment to platform owners to be unwarranted when a question of fact exists as to whether the owner created the hazard that resulted in the plaintiff's injury. *See Dupre v. Chevron U.S.A., Inc.*, 20 F.3d 154, 157-58 (5th Cir. 1994); *Smith v. Chevron U.S.A., Inc.*, Civ. A. 98-2059, 1999 WL 615174 at *2 (E.D. La. Aug. 12, 1999); *Verdin v. Shell Offshore, Inc., et al.*, Civ. A. 93-3795, 1996 WL 67660 at *3 (E.D. La. Feb. 15, 1996).

*Dupre* involved the review of a trial court order granting summary judgment to Chevron after rejecting the plaintiff's theory that Chevron was vicariously liable for the acts of the plaintiff's employer, an independent contractor. A divided panel of the Fifth Circuit vacated the order and remanded on the ground that Chevron might have been liable for its own acts of negligence. 20 F.3d at 158. The Court initially stated that "on the facts presented in this case, we find that a duty existed."

12

*Id.* at 157. Specifically, it noted that "unlike the typical vicarious liability case in which the independent contractor created the danger, in this case Chevron specifically authorized any hazardous situation created when it expressly approved the plan submitted by [independent contractor] Sundowner for the installation and set-up of its rig." *Id.* at 158. After Chevron petitioned for rehearing, the Fifth Circuit issued a second opinion denying rehearing and rehearing en banc, in which it retreated from its earlier holding that Chevron owed an independent duty to the plaintiff. *Dupre v. Chevron U.S.A., Inc.*, 33 F.3d 7 (5th Cir. 1994). In so doing, the Court clarified its stance:

> We did not set out to chart a new course in Louisiana jurisprudence in this appeal from the grant of summary judgment. We do not reject but fully accept the general principle that a platform principal owes no general duty to an independent contractor's employees to correct a hazard on the platform which was created by the contractor. We are simply unwilling to say, without the benefit of a full development of the facts and with no consideration of the argument by the trial court, that here Chevron owed no duty or, of course, that any such duty has not been breached. The trial court did not decide whether Chevron owed a duty. Nor do we now.

*Id.* at 7-8. On remand, this Court determined that Chevron's general duty of reasonable care to persons on the premises was not implicated, because the drilling rig on which the accident occurred did not qualify as an appurtenance to the platform and was therefore not part of Chevron's "premises." *Dupre v. Chevron*

13

*U.S.A., Inc.*, 913 F.Supp. 473, 477-78 (E.D. La. 1996). After taking into consideration the purpose of Chevron's review of Sundowner's schematic for placing the rig, as well as Chevron's "legitimate expectations about the limits of [its] exposure as reflected by [its] contracts" with Sundowner, this Court also rejected Dupre's theory that Chevron had acquired a duty towards Dupre by approving Sundowner's plans showing the proposed location for its drilling rig on the platform. *Id.* at 478-81.

Similarly, *Smith* and *Verdin* recognized that the duty of a platform owner to ensure the safety of the premises is implicated only when the owner creates the hazardous condition at issue. *Smith*, 1999 WL 615174 at *2 & n. 3; *Verdin*, 1996 WL 67660 at *3. Both opinions cite the Fifth Circuit's denial of rehearing in *Dupre* in support of their conclusion that the general duty of a platform owner does not require it to correct a hazard created by the contractor. *Id.*

Recently, this Court reaffirmed the principle that a platform owner has no duty to prevent or correct hazards created by its independent contractors. In *Borel v. Chevron U.S.A., Inc.*, Civ. A. 09-2799, 2009 WL 8138279 at *1 (E.D. La. Nov. 19, 2009), the plaintiff was hired by PMB Safety and Regulatory, Inc. ("PMB"), an independent contractor, to perform housekeeping duties on a platform owned by Chevron. While climbing down a ladder attached to a bunk bed after making the bed on the upper

14

bunk, the plaintiff slipped and sustained severe injuries. *Id.* As in *Smith*, *Verdin*, and *Dupre*, the plaintiff alleged that the defendant was liable for its independent acts of negligence by failing to maintain the premises in a safe condition. *Id.* Judge Feldman, citing *Dupre*, distinguished the plaintiff's claims from prior cases such as *Smith* in which the hazards were allegedly created by the platforms' owners, as opposed to their independent contractors. *Id.* at *4. Proceeding on the assumption that Chevron owned the bunk beds, Judge Feldman still determined that "to the extent that PMB employees were using the stationary ladders to make the beds pursuant to PMB instructions . . . it was PMB's responsibility to its employees to maintain these ladders in a safe condition." *Id.* at *5.

Even assuming that the pony structure constitutes a part of ConocoPhillips's "premises" for the purposes of Article 2315,[36]

---

[36] In *Dupre*, this Court examined whether the drilling rig would be considered an appurtenance to the platform for the purposes of Article 2322, the premises liability provision, in order to determine whether it constituted part of Chevron's premises under Article 2315. 913 F.Supp. at 477. Whether an attachment qualifies as an appurtenance for the purposes of Article 2322 is governed by Louisiana Civil Code Article 466. *Coulter*, 117 F.3d at 916. The Court need not decide the question, however, as plaintiff has apparently abandoned his Article 2322 claim, *see* Section C, *infra*, and because plaintiff's Article 2315 claim fails regardless of whether the pony structure had already become an appurtenance to and part of ConocoPhillips's premises. Defendant does allege, however, and plaintiff does not dispute, that the pony structure became a permanent part of the MAGNOLIA platform only *after* installation of the drilling rig was complete, which occurred some time after plaintiff's injury. *See* R. Doc. 20-4 at 2; R. Doc. 27-2 at 1.

*Dupre* and its progeny make clear that ConocoPhillips had no duty to correct an allegedly hazardous condition created by its independent contractor Nabors. According to ConocoPhillips Drilling Superintendent Mark Hildebrand, Nabors designed, fabricated, and installed the pony structure. Nabors therefore designed the opening in the pony structure deck into which Venezia's ankle slipped, and it was Nabors that was performing pre-mobilization work to install its drilling rig onto the pony structure when the injury occurred. Nabors therefore made the decision to uncover the hole as installation activities were ongoing. Like the plaintiff in *Borel*, Venezia concedes that he took his instructions from his employer rather than from the platform owner. The facts compel a conclusion that it was Nabors, not ConocoPhillips, who created any hazard that may have existed on the pony structure, and ConocoPhillips therefore had no duty to correct such a hazard.

It is unclear why Venezia argues that ConocoPhillips retained operational control over Nabors' operations–a factor that determines whether a defendant may be held vicariously liable for the acts of its independent contractor–in light of his repeated assertions that his claim is based on the negligence of ConocoPhillips and not of Nabors.[37] In fact, Venezia goes so far as to distinguish unfavorable precedent on the subject of

---

[37] R. Doc. 27 at 1, 6, 8.

operational control by pointing out that the case arose in the context of a plaintiff's vicarious liability claim and was therefore inapplicable to his own claim that ConocoPhillips itself was negligent.[38] In an abundance of caution, this Court now turns to Venezia's factual allegations in support of its operational control argument to determine whether they support either a claim for vicarious liability or a claim that ConocoPhillips' contractual relationship with and oversight of Nabors gave rise to an independent duty of care.

Whether a defendant retains operational control over the work of its independent contractor "depends in great measure upon whether and to what degree the right to control the work has been contractually reserved by the principal. The supervision and control which is *actually* exercised by the principal is less significant." *Ainsworth*, 829 F.2d at 550-51 (quoting *Hemphill v. State Farm Ins. Co.*, 472 So. 2d 320, 322 (La. Ct. App. 1985). Similarly, when a plaintiff alleges that the relationship between a platform owner and its independent contractor creates an independent duty of care on the part of the platform owner, courts look to the terms of the contract between the owner and the contractor to determine whether such a duty exists. *Graham*, 21 F.3d at 647 (citing *Crane v. Exxon Corp.*, 613 So. 2d 214, 221

---

[38] *Id.* at 8 (discussing *Ainsworth v. Shell Offshore, Inc.*, 829 F.2d 548 (5th Cir. 1987).

& n. 7 (La. Ct. App. 1992); *see also Dupre*, 913 F.Supp. at 480.

When a contract expressly delegates responsibility for the performance of operations or the safety of contractor employees to the independent contractor, courts will not hold a platform owner liable for the negligent acts of the contractor under the operational control theory. *See Coulter*, 117 F.3d at 912; *Graham*, 21 F.3d at 646; *Ainsworth*, 829 F.2d at 550; *LeJeune v. Shell Oil Co.*, 950 F.2d 267, 269 (5th Cir. 1992); *Dupre*, 903 F.Supp. at 480-82.

Much like the contracts in the above-cited cases, the Master Drilling Agreement between ConocoPhillips and Nabors specified that Nabors "shall perform all Work as an independent contractor"; that Nabors "shall have exclusive direction and control of its agents, employees and subcontractors and shall control the manner and method of carrying out the Work"; and that the "actual performance and superintendence of all Work hereunder shall be by [Nabors]."[39] It further provides that "[Nabors] shall be responsible for the Work safety and Industrial hygiene of its employees . . . and shall compile, implement and comply with policies and procedures which meet the requirements of [ConocoPhillips'] 'Contractor Health, Safety and Environment ("HSE") Requirements' attached hereto. . . ."[40] In turn, the HSE

---

[39] R. Doc. 20-2 at 11.

[40] *Id.*

Requirements state that "[Nabors] shall be solely responsible for the safety and health of its Personnel . . . ." and that Nabors is to "[use] its own experience and knowledge, [to] ascertain that the premises are safe for the proposed work before commencing operations . . . ."[41] The Master Drilling Agreement provides that the HSE Requirements "are minimum standards, and that [Nabors] shall have complete and ultimate responsibility for the safe and responsible conduct of [its] operations."[42]

It is true that ConocoPhillips has contractually reserved the right to stop work, to relieve Nabors in the event of safety violations, to require Nabors to remove certain employees, and to require Daily Drilling Reports from Nabors. Defendant is correct, however, that not one of these provisions permits the company to control the manner, method, or details of Nabors' work. *See LeJeune,* 950 F.2d at 270 (quoting *Triplette v. Exxon Corp.*, 554 So. 2d 1361, 1363 (La. Ct. App. 1989)) (finding that a contractual requirement that the contractor adhere to the principal's safety standards "does not signify the requisite right of operational control sufficient to vitiate the independent contractor relationship," and that "[t]he test for determining owner-independent contractor status is direct supervision over the step-by-step process of accomplishing the

---

[41] *Id.* at 24.

[42] *Id.* at 11.

19

work."); *Landry v. Huthnance Drilling Co.*, 889 F.2d 1469, 1471
(5th Cir. 1989) ("It is not enough that [the principal] has
merely a general right to order the work stopped or resumed, to
inspect its progress or to receive reports . . . .").

Nor has ConocoPhillips undertaken the type of contractual
duty to make inspections of the pony structure that would compel
a different result. Though the Process Safety Management ("PSM")
requirements found in the HSE manual obligate ConocoPhillips to
make certain safety inspections, these requirements apply only to
OSHA PSM facilities, which include oil production facilities, but
not oil drilling or servicing operations. 29 C.F.R. § 1910.119
(2013); *see also* "PSM Applicability to Oil/Gas Production
Facilities," OSHA Archive, U.S. Dept. of Labor,
https://www.osha.gov/pls/oshaweb/owadisp.show_document?p_table=IN
TERPRETATIONS&p_id=22839 (last accessed January 8, 2014).
Therefore, the PSM requirements found in the HSE Manual would
govern activities occurring on the platform, which is a
production facility,[43] but not necessarily on the pony structure,
where only drilling operations were to take place.  Even if the
PSM regulations of Section 1910.119 extended to drilling rig
because of its location on the platform, the regulations govern
the safe handling of "toxic, reactive, flammable, or explosive
chemicals." § 1910.119. Any inspections performed pursuant to the

---

[43] R. Doc. 27-1 at 18.

PSM provisions of the HSE manual would be solely to determine compliance with the requirements of § 1910.119 and would have nothing to do with contractor safety or accident prevention other than the containment of toxic chemicals.

Venezia also argues that the responsibilities of Byron McMichael, Percy Angelle, and Mark Hildebrand in supervising platform operations and interfacing with Nabors demonstrate that ConocoPhillips retained operational control over Nabors's work. McMichael oversaw safety on the MAGNOLIA platform and was responsible for ensuring that Nabors followed the HSE manual and performed pre-work job safety analyses ("JSAs"). Similarly, Angelle interfaced with Nabors to ensure that it had the necessary equipment and that its employees understood and followed the relevant protocols. ConocoPhillips required Nabors to obtain its approval before starting the pre-mobilization process. Approval, however, was contingent only on Nabors performing a JSA and furnishing its employees with proper tools and safety equipment.[44] ConocoPhillips employees do not participate in or supervise the JSAs, which are performed by Nabors.[45]

Venezia cites *Denson v. Diamond Offshore, Co.*, 955 So. 2d 730 (La. Ct. App. 2007), in support of its argument that the

---

[44] R. Doc. 27-1 at 17.

[45] *Id.* at 28.

interactions between these men and Nabors' employees create a
question of fact as to operational control. In that case, the
Louisiana Court of Appeal held that the lighting safety checks
and twenty-four hour on-call status of the defendant's "company
man" created questions of fact as to the defendant's operational
control over the work of its independent contractor. *Id.* at 734.
Unlike the contract between ConocoPhillips and Nabors, however,
the contract between the defendant and the contractor in *Denson*
specifically reserved to the defendant the right to control the
daily operations of the contractor and required the contractor to
comply with "all instructions . . . including, without
limitation, drilling, well control and safety instructions." *Id.*
at 733.  The Fifth Circuit in *LeJeune* and this Court in *Dupre*
have made clear that even a "comprehensive" safety inspection
program will not result in a finding of operational control over
the contractor's work when the terms of the contract
unambiguously indicate that safety is the ultimate responsibility
of the contractor. *Dupre*, 913 F. Supp. at 481-82; *LeJeune*, 950
F.2d at 269-270. The general rule remains:

> [T]he fact that a principal . . . reserves the right to
> monitor its contractor's performance and stations a "company
> man" on the platform who observes the contractor's
> activities, has the right to make safety recommendations to
> the contractor, and is obligated to report continuing unsafe
> work practices or conditions to his superiors, does not mean
> that the principal controls the methods or details of the
> contractor's work.

*Coulter*, 117 F.3d at 912. "Absent an express or implied order to

22

the contractor to engage in an unsafe work practice leading to an injury, a principal . . . cannot be liable under the operational control exception." *McCarroll v. BP Am. Prod. Co.*, CIV. A. 10-1834, 2011 WL 4727831 (E.D. La. Oct. 6, 2011) (citing *Coulter*, 117 F.3d at 912).

The considerations that preclude a finding of operational control and by extension, vicarious liability, also compel the conclusion that ConocoPhillips did not owe an independent duty to Nabors' employees based on the terms of the contract. As discussed above, courts look to the terms of the contract when deciding whether the relationship of the platform owner to the contractor gives rise to an independent duty to ensure the safety of the contractor's employees, just as they do in making an operational control determination. Further, this Court has observed:

> To create a duty based on plaintiff's claim that [a platform owner] "examin[ed] its contractor's work place, procedures and equipment for safety concerns" would amount to an end-run around a large body of Fifth Circuit precedent finding no "operational control" despite some knowledge of risk or involvement with safety issues and the presence of "company men" on the contractor's rig.

*Dupre*, 913 F.Supp. at 483; *accord In re Oil Spill by the Oil Rig Deepwater Horizon in the Gulf of Mexico, on April 20, 2010*, 808 F. Supp. 2d 943, 963 (E.D. La. 2011). Plaintiff has failed to demonstrate an issue of material fact as to whether ConocoPhillips is liable under Article 2315, because the facts

23

show neither that the defendant retained operational control over Nabors' operations, nor that the defendant owed an independent duty to the plaintiff.

**B. Custodial Liability under Articles 2317 and 2317.1**

Next, ConocoPhillips argues that no genuine issue of material fact exists as to its custodial liability under Louisiana Civil Code Article 2317 and 2317.1, because it was not in custody of the site of the accident, the pony structure, when the injury occurred. Article 2317 was a basis for the imposition of strict liability on the owner or custodian of an object that causes an injury. La. Civ. Code art. 2317 (1996); *see*, *e.g.*, *Reaux v. Deep S. Equip. Co.*, 840 So. 2d 20, 24 (La. Ct. App. 2003). Article 2317.1 modifies Article 2317 by removing strict liability and imposing liability on an owner or custodian of an object only if the object causes damage "occasioned by its ruin, vice, or defect, only upon showing that [the owner] knew of the ruin, vice, or defect . . ., that the damage could have been prevented by the exercise of reasonable care, and [the owner] had failed to exercise such reasonable care." La. Civ. Code art. 2317.1 (1996); *Reaux*, 840 So. 2d at 24.

The threshold requirement for custodial liability, and the basis for ConocoPhillips's motion for summary judgment, is that the defendant must be in custody of the object that is the cause of the plaintiff's injury. *See Ainsworth*, 829 F.2d at 551.

24

"Custody" in this context means "supervision and control." *Id.*
Ownership creates a presumption of custody that may be rebutted
"by showing that the owner (1) did not receive a substantial
benefit from ownership nor (2) had any control or authority over
the [object]." *Royer v. Citgo Petroleum Corp.*, 53 F.3d 116, 119
(5th Cir. 1995). Similarly, "a non-owner may have custody if it
exercises 'control of the thing and [derives] some benefit from
it.'" *Borel*, 2009 WL 8138279 at *6 (quoting *Coulter*, 117 F.3d at
914).

Hildebrand indicated that the pony structure became a
permanent part of the MAGNOLIA platform only after installation
of the drilling rig was complete some time after Venezia's
injury.[46] Venezia does not dispute this in his response to
ConocoPhillips's Statement of Uncontested Material Facts.[47]
Because it seems apparent that ownership of the pony structure
did not pass to ConocoPhillips until after Venezia's accident,
the inquiry here focuses on whether the company exercised control
over the pony structure and derived some benefit from it.

Venezia relies on *Dobbs v. Gulf Oil Co.*, 759 F.2d 1213 (5th
Cir. 1985), and *Haas v. Atlantic Richfield*, 799 F.2d 1011 (5th
Cir. 1986), for the proposition that control is established when
a platform owner "had some responsibility for overseeing the

---

[46] R. Doc. 20-2 at 2.

[47] R. Doc. 27-2 at 1.

safety of the operations" performed by a contractor who owned the injury-causing device. He also relies on these cases in support of his argument that a defendant "derives benefit" from the pony structure simply by receiving revenues from oil production that result from Nabors's drilling operations. Later cases, however, seem to reject both principles espoused by *Haas* and *Dobbs*. For example, the Louisiana Court of Appeal distinguished the holding of the two cases on the issue of control in *Parker v. Boise Southern Co.*, 570 So. 2d 6 (La. Ct. App. 1990). The court determined that when a contract specifies that the contractor shall be responsible for the safety of its employees, that the principal reserves the right to inspect for safety compliance does not demonstrate that the principal retained control over the injury-causing device. *Id.* at 9-10. The Fifth Circuit was in agreement in *Coulter*, when it found that Texaco was not in custody of a defective drill collar pipe rack that caused the plaintiff's injury, even though Texaco "reserve[d] the right to monitor its contractor's performance and station[ed] a 'company man' on the platform who observ[ed] the contractor's activities, ha[d] the right to make safety recommendations to the contractor, and [was] obligated to report continuing unsafe work practices or conditions to his (Texaco) superiors." 117 F.3d at 912-14. *See also Axon v. Noble Drilling Corp.*, 769 F. Supp. 960, 963-64 (E.D. La. 1991) (holding that platform owner lacked custody of galley

26

door on drilling rig despite fact that owner's representatives "had complete access to the rig for the purposes of observing and inspecting operations to assure compliance with the contract.").

Similarly, cases such as *Coulter*, *Ainsworth*, and *Axon* ignore altogether the indirect benefit discussed in *Dobbs* and *Haas* that a platform owner obtains from a drilling rig owned and operated by an independent contractor. This is perhaps because a plaintiff must establish that a defendant both controlled the injury-causing device and derived a benefit from it in order to overcome a lack of ownership, and in all three cases the court found that the defendant was not in control of the drilling rig. Regardless, the benefit ConocoPhillips derived from the pony structure was somewhat more attenuated than the benefits obtained by the defendants from the drilling rig components in *Dobbs* and *Haas*. Unlike the rig itself, which drills oil wells for the benefit of ConocoPhilliips's production facility on the platform, the pony structure serves only to support the rig while Nabors is engaged in drilling operations. Hildebrand testified to this effect, noting that the pony structure "serves no purpose for ConocoPhillips." He further stated:

> The tension leg platform is a production facility. That pony structure does not assist in this in any shape or manner. It is only there to house Nabors' equipment. . . . It is not used at all until we bring Nabors on board.[48]

---

[48] R. Doc. 27-1 at 18.

Venezia argues that courts also must consider "whether the party . . . took an active role in overseeing the project, and whether the object in question was to be permanently or only temporarily affixed to the surrounding property."[49] But the evidence does not support the conclusion that ConocoPhillips took an active role in mounting the pony structure on the platform or in the pre-mobilization work to attach the drilling rig to the pony structure. Venezia testified that McMichaels and Angelle were occasionally present on the pony structure and had stopped Nabors' work a few times when things appeared unsafe.[50] But every individual on the platform possessed such authority,[51] as is common on platforms such as the MAGNOLIA. Other than observing Nabors' work to ensure compliance with the HSE Manual and requiring Nabors to obtain pre-work approval for each job by performing a JSA and furnishing proper tools and safety equipment, ConocoPhillips provided no input into the manner in which Nabors performed the work. No ConocoPhillips employees were involved in the pre-mobilization process, and Nabors assumed sole responsibility for its pre-mobilization work. Venezia never took instructions from anyone with ConocoPhillips.

---

[49] R. Doc. 27 at 16 (quoting *Willard v. Bd. of Comm'rs of the Port of New Orleans*, Civ. A. 02-3594, 2003 WL 1733552 at *5 (E.D. La. 2003).

[50] R. Doc. 20-3 at 36-37.

[51] *Id.* at 38.

28

The Court acknowledges that the parties intended for the pony structure to remain in place after the conclusion of Nabors' drilling operations. But as Hildebrand testified:

> [T]he reason it was left there is because it was—just been too laborious and too expensive to remove it in between drilling operations. Put another way: It is not used at all until we bring Nabors on board.[52]

Though Hildebrand indicates that the pony structure became a "permanent part" of the MAGNOLIA platform after installation of the drilling rig was complete,[53] it was not permanently affixed to the platform. Rather, it sits atop a set of skid beams that are part of the platform and is held in place by a series of clamps.[54] It is used solely by Nabors to house its equipment and can be removed at any time. Nabors designed, fabricated, and installed the pony structure, and it did not relinquish control of the structure until its drilling operations were complete.[55]

Though the intent to permanently affix the pony structure to the platform is a factor that weighs in favor of Venezia, the Court also must consider the manifestly clear intent of both ConocoPhillips and Nabors that Nabors would be solely responsible for pre-mobilization work on the pony structure and for the safety of its employees during the completion of the project.

---

[52] R. Doc. 27-1 at 18.

[53] R. Doc. 20-2 at 2.

[54] R. Doc. 27-1 at 18-19.

[55] R. Doc. 20-2 at 2.

This Court has emphasized "the propriety of honoring the parties' legitimate expectations about the limits of their exposure as reflected by their contracts, absent some strong indication that they acted inconsistently with their agreed allocation of risk." *Dupre*, 913 F. Supp. at 480 (discussing 2315 liability). In light of the virtually complete control that Nabors exercised over the pony structure at the time of Venezia's accident, the Court finds that no issue of material fact exists as to whether ConocoPhillips was in custody of the pony structure.

## C. Premises Liability under Article 2322

Finally, ConocoPhillips claims that no genuine issue of material fact exists as to its liability under Louisiana Civil Code Article 2322, which imposes liability on the owner of a building for injuries that result from the building's "ruin, when this is caused by neglect to repair it, or when it is the result of a vice or defect in its original construction." La. Civ. Code art. 2322 (1996). The building owner is liable "only upon a showing that he knew or, in the exercise of reasonable care, should have known of the vice or defect which caused the damage, that the damage could have been prevented by the exercise of reasonable care, and that he failed to exercise such reasonable care." *Id.* Under Article 2322, a fixed oil platform is a building. *Olsen v. Shell Oil. Co.*, 365 So. 2d 1285, 1289 (La. 1978).

Article 2322 does not impose liability on the owner of a
building for ruin during the building's construction or the
"addition of an appurtenance." *Ainsworth*, 829 F.2d at 552. In
*Ainsworth*, the Fifth Circuit held that the installation of a
drilling rig onto a platform is an addition of an appurtenance,
and Article 2322 therefore does not impose liability on the
platform owner for injuries that arise during the drilling rig
installation. *Id.* ConocoPhillips argues that because installation
of Nabors' drilling rig was incomplete when Venezia was injured,
it cannot be liable under Article 2322. This argument
misleadingly conflates the pony structure with the drilling rig.
Venezia has not argued that construction of the pony structure
was complete at the time of the accident, however, and the
parties have presented no evidence suggesting that this is the
case.

Moreover, the hole into which Venezia's ankle slipped was
one of a number of such holes on the pony structure. At the time
of the accident, Nabors employees were installing rig equipment
into the holes so that the rig would sit atop the pony structure.
Venezia testified that the dampener that would normally cover the
hole was not in place because the installation work was still
ongoing.[56] Because the pony structure and the drilling rig come
together as a single unit during the installation process, the

---

[56] R. Doc. 20-3 at 55.

31

pony structure is reasonably viewed as a component part of the rig while it sits atop the platform.

More importantly, Venezia did not respond at all to ConocoPhillips' arguments in support of summary judgment on the Article 2322 claim. Failure to address a claim in response to a defendant's summary judgment motion constitutes abandonment of the claim. *See Vela v. City of Houston*, 276 F.3d 659, 678-79 (5th Cir. 2001). Accordingly, the Court finds no material issue of fact as to ConocoPhillips' liability under Article 2322.

## IV. CONCLUSION

For the foregoing reasons, the Court grants defendant's motion for summary judgment.

New Orleans, Louisiana, this 8th day of January, 2014.

_____
SARAH S. VANCE
UNITED STATES DISTRICT JUDGE